ATCHISON, TOPEKA AND SANTA FE
RAILWAY COMPANY, et al.,
Plaintiffs,

v.

Howard H. CALLAWAY et
al., Defendants.

IZAAK WALTON LEAGUE OF
AMERICA et al., Plaintiffs,

v.

Howard H. CALLAWAY et
al., Defendants.

Civ. A. Nos. 74–1190, 74–1191.

United States District Court,
District of Columbia.

March 16, 1979.

On Motion to Narrow Issues Sept.
10, 1979.

Joseph V. Karaganis, Sanford R. Gail, Joseph D. Feeney, Stuart E. Vaughn, Chicago, Ill., for plaintiffs.

Richard Boyd, Asst. Atty. Gen. of Wisconsin, Madison, Wisc., for plaintiff-intervenor, State of Wisconsin.

Fred R. Disheroon, Irwin L. Schroeder, Dept. of Justice, Washington, D.C., for defendants.

Ramsay D. Potts, George V. Allen, Jr., J. Thomas Lenhart, Washington, D.C., for defendant-intervenor, Association for the Improvement of the Mississippi River.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Several environmental organizations and Midwestern railroads brought these actions in August of 1974, seeking to enjoin officials of the Army and the Army Corps of Engineers from letting bids for the reconstruction of Lock and Dam 26 located at Alton, Illinois. The plaintiffs claimed that the Army Corps of Engineers' actions at Alton foreshadowed their intention to rebuild the entire Upper Mississippi River

System. The gravamen of the original complaint was that these actions violated the National Environmental Policy Act (hereinafter, "NEPA"), 42 U.S.C. § 4321 *et seq.*, as well as other statutes, because the Army Corps of Engineers had failed to obtain Congressional authorization for the project, and prepared an Environmental Impact Statement (hereinafter, "EIS") inconsistent with the facts and the law because it inadequately assessed the benefits and costs of their plan, and failed to consider the available alternatives.

On August 6, 1974, a temporary restraining order was issued enjoining the defendants from letting bids for the construction of the proposed Lock and Dam 26. On September 6, 1974, the Court issued a preliminary injunction prohibiting the defendants from proceeding with the project until the defendants obtained the consent of Congress and cured the defects in the EIS. 382 F.Supp. 610 (D.D.C. 1974). In 1976, the Corps withdrew its original two-lock proposal, and instead sought Congressional authorization for a single-lock replacement facility with an estimated annual capacity significantly less than that recommended in the original proposal. On May 2, 1977, the Court dissolved the preliminary injunction without prejudice because no construction was eminent. 431 F.Supp. 722 (D.D.C. 1977). At the same time, the Court denied the motion to dismiss of the defendants and the defendant-intervenors, and held that NEPA requires the Corps of Engineers to submit an EIS to Congress with its proposal for authorizing legislation for the construction of a replacement Lock and Dam 26. Furthermore, the Court held that plaintiffs in these actions have a right of action and standing to challenge the adequacy of the EIS prepared by the defendants. Finally, the Court held that plaintiffs' claims for declaratory relief as to the adequacy of the EIS is justiciable. On October 4, 1978, the Court denied the parties' cross-motions for summary judgment, in part, and ordered that an evidentiary hearing be held to resolve disputed issues of material fact with respect to the issue of the adequacy of the Final EIS prepared by the Corps of Engineers to accompany its proposal of legislation authorizing the construction of Lock and Dam 26. 459 F.Supp. 188 (D.D.C. 1978). On October 21, 1978, President Carter approved Public Law 95–502, which authorized a single lock replacement for Lock and Dam 26. On December 11, 1978, the plaintiffs filed an amended complaint. Currently before the Court are the renewed motions of the federal defendants and the intervenor-defendants for summary judgment. The basis for the instant skirmish in the episodic saga of Lock and Dam 26 is disagreement over the effect of the enactment of Public Law 95–502. For the reasons that follow, the Court will deny the renewed motions for summary judgment.

The federal defendants accurately portray the essential effects of Public Law 95–502:

(1) It authorizes the construction of a replacement Lock and Dam 26 at Alton;

(2) It requires the development of a master plan for the Upper Mississippi River System following a comprehensive study of the effects of expansion of the navigational capacity beyond that to be afforded by the new lock;

(3) It prohibits further expansion of the navigational capacity of the Upper Mississippi System until the Congress approves a master plan for its management; and

(4) It establishes a user charge on the inland waterways in order to recover some of the public investment in those waterways.

The defendants and the defendant-intervenor, Association for the Improvement of the Mississippi River (hereinafter, "AIMR"), contend that summary judgment should now be granted because the issues in this case have been decisively dealt with by Congress. Since the plaintiffs are challenging the adequacy of a legislative EIS, which is primarily prepared for the benefit of Congress, once Congress has acted, it is contended that judicial enforcement of NEPA is improper. According to the defendant intervenor:

Legislation cannot be vacated or otherwise rendered ineffective or unenforceable by a court on the ground that congressional procedure failed to comply with NEPA. A law is not to be declared invalid because the antecedent legislative recommendation was accompanied by an EIS which a court pronounces to be defective. An after-the-fact judicial declaration that the legislative EIS was inadequate is an affront to Congress. NEPA was plainly not intended to authorize courts to protect Congress from its own future inability to discern EIS inadequacies or to withhold action on Executive Branch proposals which are accompanied by a defective EIS.

Defendant-intervenor AIMR's Memorandum on the Effect of Congressional Action on this Case, at 11 (November 13, 1978).

■ This approach illustrates AIMR's misperception of the Court's role in this controversy. The issue presented to this Court by the defendant's actions and the plaintiffs' suit is simply not as facile as the defendants apparently contend. Congress has enacted both Public Law 95–502 and NEPA. The former requires the Corps of Engineers to submit legislative EIS's to Congress. The plaintiffs have challenged the adequacy of the EIS submitted to Congress with respect to Public Law 95–502. Nowhere in Public Law 95–502 has Congress indicated that it wants Public Law 95–502 to be exempt from NEPA's exacting requirements. Congress has shown that it is fully capable of expressing its desire to exempt projects from the environmental laws. For example, the Trans-Alaska Pipeline Act, Public Law 93–153, provides that "actions . . . shall be taken without further action under the National Environmental Policy Act." Furthermore, in this case, rather than expressing any intention to exempt the project from NEPA, members of Congress made several statements indicating that they fully expected this Court to proceed with the determination of the adequacy of the EIS:

> MR. SCHMITT. One, with respect to the court case of Judge Richey, that case has basically two components or two hurdles that need to be surmounted. One was the lack of authorization of locks and dam 26 and two was the adequacy of the environmental impact statement on locks and dam 26.
>
> The bill at least clears the initial hurdle, that is, a lack of authorization of the facility. The Department of Transportation has in addition said that it will do all it can to expedite the decision on the second hurdle. So I believe that at least we have taken a step in the right direction.

Cong.Rec.S. 18050 (daily ed. Oct. 10, 1978). (Remarks of Senator Schmitt). *See also* Cong.Rec.S. 10477 (daily ed. June 22, 1977) (Statement of Senator Nelson); Cong. Rec.H. 2700 (daily ed. October 13, 1978) (Statements of (Representative Edgar); Cong.Rec.S. 6603 (daily ed. May 1, 1978) (Statements of Senator Long).

■ Moreover, the Supreme Court has made it perfectly clear that repeal by implication is disfavored especially in the environmental context. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978). In *Hill* the Court stated that " 'in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.' " *Id.* quoting *Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). In this case, there has been no demonstration of any intention to repeal NEPA, and plainly the two statutes are not irreconcilable. In the words of *Committee for Nuclear Responsibility v. Seaborg*, 149 U.S.App. D.C. 380, 382, 463 F.2d 783, 785 (1971), "[t]here is, of course, nothing inconsistent with adoption of appropriations and authorizations measures on the *pro tanto* assumption of validity, while leaving any claim of invalidity to be determined by the courts." *See National Audubon Society v. Andrus*, 442 F.Supp. 42, 46 (D.D.C. 1977).

Accordingly, the motions for summary judgment are denied. An order in accordance with the foregoing will be issued of even date herewith.

## ON MOTION TO NARROW ISSUES

Defendants have moved to narrow the issues in this case on the eve of trial. Specifically, they have requested the Court to decline review of all aspects of the "cost/benefit" analysis performed by the defendant United States Army Corps of Engineers pursuant to the Water Resources Policy Act of 1965, 42 U.S.C. § 1962 *et seq.* and the Corps' planning regulations, 33 C.F.R. pts. 290–295 (1978). Because the Court is persuaded that defendants' motion has a limited veracity, it grants the motion in part and dismisses counts I, II, IV, V, VI, VII and IX of plaintiffs' Amended Complaint (filed December 11, 1978). The Court's ruling, however, does not eliminate the issue of the propriety of defendants' cost/benefit analysis. By declining to dismiss count VIII, the Court holds that this analysis is subject to judicial review to determine its adequacy under the National Environmental Policy Act, § 101(b), 42 U.S.C. § 4331(b).

Generally, this Court's prior decisions have been limited to an examination of the adequacy of plaintiffs' claims under the National Environmental Policy Act. The Court has never discussed either the prima facie viability of the claims made under other statutes and regulations or the impact upon those claims of congressional authorization of Lock and Dam 26. A treatment of these issues is, of course, imperative before trial and the Court now turns its attention to that matter. The background of this litigation is fully set forth in the Court's three prior published opinions, 382 F.Supp. 610 (D.D.C. 1974) (granting a preliminary injunction and requiring congressional approval), 431 F.Supp. 772 (D.D.C. 1977) (dissolving the preliminary injunction without prejudice and upholding plaintiffs' right to seek review of the environmental impact statement), 459 F.Supp. 188 (D.D.C. 1978) (denying motions for summary judgment), and thus, need not be repeated here. One new fact, however, should be noted: on October 21, 1978, Congress accepted defendants' proposal and authorized the Secretary of the Army "to replace locks and dam 26, Mississippi River, Alton, Illinois, and Missouri, by constructing a new dam and a single, one-hundred-and-ten-foot by one-thousand-two-hundred-foot lock at a location approximately two miles downstream from the existing dam . . . ." Act of October 21, 1978, Pub.L.No. 95–502, § 102(a), 92 Stat. 1695.

■ In narrowing the scope of this case prior to trial, the Court relies upon fundamental differences between the National Environmental Policy Act ("NEPA") and the other statutes and regulations upon which plaintiffs' base their claims. In prior decisions, this Court has ruled that congressional approval of Lock and Dam 26 at Alton, Illinois, see Pub.L.No. 95–502, 92 Stat. 1693 (1978), did not preclude judicial review of the Environmental Impact Statement (EIS) submitted to Congress as part of the legislative proposal. Order of March 16, 1975. Indeed, after a careful review of the legislative record, the Court was drawn to the conclusion that Congress foresaw—and intended—the judicial scrutiny normally afforded EISs. *Id.,* at 975. The Court's holding in its Order of March 16, 1979, was fully consistent with its prior conclusion that plaintiffs' possessed standing to enforce NEPA's requirement that an EIS accompany "proposals for legislation," 42 U.S.C. § 4332(2)(c). *Atchison, Topeka and Santa Fe Railway v. Callaway,* 431 F.Supp. 722, 727 (D.D.C. 1977). (This type of EIS is commonly called a "legislative EIS.") Both holdings reflect the Court's belief that judicial review of legislative EISs does not involve undue interference with the legislative process. The EIS requirement was intended by Congress not merely as a legislative aid, but also "to provide detailed environmental information *to the public* to permit them to participate in a meaningful way in further decision-making both at the administrative and legislative levels." *Id.* at 727 (emphasis added). Thus, plaintiffs' interest in ensuring defendants' compliance with NEPA supports judicial review of all aspects of defendants' EIS.

Defendants' assertion that their cost/benefit analysis is so complex as to preclude judicial review is simply without merit. In *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 39, 449 F.2d 1109 (1971), the court of appeals for this circuit indicated that EIS review may involve the "actual balance of costs and benefits" and that "[i]n some instances environmental costs may outweigh economic and technical benefits and in other instances they may not." *Id.* 146 U.S. App.D.C. at 37, 449 F.2d at 1113 & 1115. Moreover, in *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), the Second Circuit held that a cost-benefit analysis attached to an EIS pursuant to 40 C.F.R. § 1500.8(a)(8) (1978) was not immune from NEPA review. This Court has previously indicated its approval of the Second Circuit's approach in *County of Suffolk, see Atchison, Topeka and Santa Fe Railway, v. Callaway*, 459 F.Supp. 188, 192 (D.D.C. 1978) and in permitting cost/benefit review under NEPA the Court re-affirms that approval.

The Court's post-authorization review of cost/benefit analysis under NEPA, however, does not support the review of procedural or substantive errors under other statutes or regulations, when Congress intended those laws to serve a more limited purpose than NEPA. For example, the Eighth Circuit has held that a cost/benefit analysis prepared pursuant to 33 U.S.C. § 701a, the preamble to the Flood Control Act of 1936, was not reviewable to determine whether costs exceeded benefits, once Congress had approved the project proposed in the analysis. *Environmental Defense Fund v. Froehlke*, 473 F.2d 346, 356 (8th Cir. 1972). Evidently, the court construed section 701a as intended solely for the benefit of Congress and thus, once that body had exercised its judgment by accepting the proposal, judicial rejection of the underlying analysis would involve an unwarranted interference with the legislative process. Yet, although the court declined to review the cost/benefit analysis under the Flood Control Act of 1936, it pointed out that the "relief requested by the plaintiffs under § 701a is partially available under NEPA." 473 F.2d at 356. Because the district court would have to "determine whether the actual balance of costs and benefits struck by the agency" comported with the standards of NEPA, some examination of the analysis was appropriate. *Id.; accord, Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1134 (5th Cir. 1974). *See also* W. Rodgers, *Handbook on Environmental Law* § 7.5, at 746–747 (1977 ed.). In limiting the plaintiffs' cost/benefit claims to those under NEPA, this Court adopts a similar rationale. The judiciary should defer to congressional expertise in the weighing of costs and benefits, except where Congress has indicated that judicial scrutiny is appropriate. Plaintiffs rely upon only one statute which calls for the type of scrutiny which they seek—NEPA. And under NEPA, the Court must examine the EIS in its entirety to determine its conformity with the legislative intent expressed in the statute. Plaintiffs' have not presented this Court with any evidence to support the conclusion that Congress intended the courts to engage in a similarly comprehensive examination to determine agency compliance with other laws and regulations after the legislature has studied and approved the proposals submitted in alleged conformance with those rules. In the face of this silence, the Court declines to intervene in this aspect of the legislative process. A review of the specific laws upon which plaintiffs rely fully supports this conclusion.

The Water Resources Planning Act of 1965, 79 Stat. 244, (the Act) creates an inter-agency Water Resources Council and directs the Council to establish "principles, standards, and procedures for . . . the formulation and evaluation of Federal water and related land resource projects." 42 U.S.C. § 1962a–2 (1976). In 1973, the Council issued its *Principles and Standards for Planning Water and Related Land Resources* at 38 Fed.Reg. 24778–24868; two years later, the Corps adopted regulations

set forth at 33 C.F.R. pts. 290–295 (1978), which were designed to implement these principles. The Water Resources Planning Act, however, is clearly designed with a less sweeping purpose than NEPA. By calling for the evaluation of certain projects, its primary goal is to provide the President and Congress with guidance in their planning efforts in the water resources field. *See* H.R.Rep.No. 169, 89th Cong., 1st Sess. 3 & 5 (1965), U.S. Code Cong. & Admin. News 1965, p. 1921. Because these guidelines are intended for the primary benefit of Congress and the President, approval of a recommended project by these lawmakers vitiates whatever claims a party may possess regarding the Corps of Engineers compliance with the Act and regulations thereunder. In this case, Congress has itself weighed the costs and benefits[1] and, by authorizing construction, indicated its finding that the benefits exceeded costs, within the meaning of the Water Resources Planning Act. Once Congress has reached a decision on this matter, courts should decline to interfere with the legislative judgment. *Cf. Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 527–528, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941).[2] In contrast to NEPA, Congress did not envision continuing judicial review to determine compliance with the Act. *See* Order, at 975 (1979). Accordingly, the Court must dismiss Count V of plaintiffs' Amended Complaint because it calls for a substantive re-evaluation of the economic costs and benefits of the construction proposal to determine their adequacy under the Water Resources Planning Act. Count VII requires a similar substantive re-evaluation under 33 C.F.R. § 290.11(c), a regulation issued in accordance with the Water Resource Council's principles and standards; the Court must also dismiss that count. Counts I, IV and IX relate to the defendants' alleged failure to comply with various procedural requirements of the Act. All of the defects could have been—or were in fact—brought to the attention of Congress during the legislative process;[3] yet, Congress decided to accept the proposal despite the alleged non-compliance with the Water Resources Planning Act. The Court believes that congressional approval of the Lock and Dam 26 project is tantamount to a finding that these oversights either never occurred or were, for the purposes of the Act and its regulations, insignificant. It would certainly constitute an invasion of the legislative process for this Court to breathe new life into these allegations and then seek to determine their accuracy. Accordingly, counts I, IV and IX of the Amended Complaint shall be dismissed.

Plaintiffs' Amended Complaint contains two other counts which merit discussion. In count VI, plaintiffs complain that the Corps' inclusion of future delay charges as part of the transportation charges to traffic

---

1. The legislative record of Pub.L.No. 95–502, 92 Stat. 1693 (1978), shows extensive consideration of all aspects of the Lock and Dam 26 proposal. *See* S.Rep.No. 95–215, 95th Cong., 1st Sess. (1977); H.R.Rep.No. 95–545 pt. 1, 95th Cong., 1st Sess. (1977); 124 Cong.Rec. S18,043–052 (daily ed. Oct. 23, 1978); *id.* H12,695–702; *Proposed Waterway User Charges and Replacement of Locks and Dam 26: Hearings on S. 712, S. 790 & S. 923 Before the Subcomm. on Water Resources of the Senate Comm. on Environment and Public Works*, 95th Cong., 1st Sess. (1977); *Replacement of Locks and Dam 26 at Alton, Illinois: Hearings Before the Subcomm. on Water Resources of the House Comm. on Public Works and Transportation*, 95th Cong., 1st Sess. (1977); *Locks and Dam 26: Hearings on S. 1285, S. 3425 & S. 3506 Before the Subcomm. on Water Resources of the Senate Comm. on Public Works*, 94th Cong., 2d Sess. (1976).

2. The Court finds further support for its holding in *Concerned Residents of Buck Hill Falls v. Grant*, 537 F.2d 29 (3d Cir. 1976). In that case, the Third Circuit held that a cost/benefit analysis prepared by the Soil Conservation Service in conjunction with one part of a four dam project, was properly subject to judicial review *after* a congressional committee had appropriated funds for the project. 537 F.2d at 34–35. The circuit court distinguished the case before it from the situation which is presented to this Court, where "Congress [has] *specifically authorized* the project [ ] after receiving and reviewing" the cost/benefit analysis and "after consideration of [the project's] economic merits." *Id.* at 35 (emphasis added).

3. The legislative record is set forth at note 1 *supra*.

on the existing system violates section 7(a) of the Department of Transportation Act, 49 U.S.C. § 1656(a). This statute provides the Water Resources Council with authority to set up standards for the economic evaluation of water resource projects and also requires the Council to adhere to a statutory definition of the "primary direct navigation benefits" of such a project. Here again, the statutory and regulatory criteria are intended primarily for the benefit of the nation's lawmakers and they have already indicated their approval, under this statute, of the method used to evaluate the economic costs which plaintiffs seek to contest. It would be no less improper for the Court to re-scrutinize that decision than to re-examine the decisions previously discussed. Finally, count II of the Amended Complaint alleges non-compliance with both section 122 of the River and Harbors Act of 1970, Pub.L.No. 91–611, 84 Stat. 1823, and the regulations issued pursuant to that statute. The Court, however, is persuaded that this statute was also intended to aid Congress alone in the evaluation of a particular construction project.[4] Congress having made the decision to build, the Court will not interfere with that decision to assess defendants' compliance with laws designed solely to assist the legislature.[5]

In sum, the Court holds that Congress intended NEPA to stand on a different footing from the other statutes upon which plaintiffs' rely. In contrast to other pre-authorization studies, legislative EISs are not designed solely for the benefit of lawmakers. Because Congress has declared that significant public interests are implicated in any decision affecting the environment, the Court must provide plaintiffs with an opportunity to challenge the adequacy under NEPA of the legislative EIS for Lock and Dam 26—notwithstanding congressional approval of the project.

In order to fully accomplish the objectives of NEPA, this review must include an examination of the defendants' cost/benefit analysis as sought by count VIII. Yet, even, though the Court must review this analysis to determine its adequacy under NEPA, it need not scrutinize the same studies to determine their compliance with the Water Resources Planning Act or other statutes and regulations designed to assist Congress in evaluating the merits of a proposed construction project. Plaintiffs have not introduced—and the Court has not found—a shred of evidence to support the assertion that, with respect to these statutes other than NEPA, Congress intended the extraordinary remedy of injunctive relief from a district court. Compliance with, and enforcement of, these statutes is thus best left to the legislature.

Because defendants' pre-trial motion has been limited to counts I through X of the Amended Complaint, nothing in this opinion affects plaintiffs' right to proceed under count XI, involving the need for, or lack of, post-authorization studies by the defendants.

An order in accordance with the foregoing shall be issued of even date herewith.

---

4. This conclusion is fully consistent with this Court's prior treatment of section 122 of the Rivers and Harbors Act of 1970, Pub.L.No. 91–611, 84 Stat. 1823. In issuing a preliminary injunction in 1974, the Court held plaintiffs' claims under this statute cognizable. *Atchison, Topeka and Santa Fe Railway v. Callaway*, 382 F.Supp. 610, 623 (D.D.C. 1974). However, this conclusion included a caveat: "[S]ince the requirements of Section [] 122 . . . are similar to those of NEPA, it is unnecessary at this stage to examine in depth the Plaintiffs' allegations in this respect . . . ." *Id.* Significantly, the Court recognized plaintiffs' claims under the statute *prior* to congressional authorization of Lock and Dam 26. Because legislative authorization signals acceptance by Congress, the party intended to benefit from the statute, it ends the need for judicial intervention.

5. *See* note 2 *supra.*